UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


INNOVATIVE GLOBAL SERVICES, LLC, ET AL.          CIVIL ACTION

v.                                               NO. 12-516

WEB.COM GROUP, INC., ET AL.                      SECTION "F"


ORDER AND REASONS

Before the Court are Web.com's and NetObjects' motions to dismiss or transfer the intellectual property litigation pending before this Court. For the reasons that follow, the motions to dismiss for lack of personal jurisdiction are GRANTED.

**Background**

This copyright infringement and breach of contract litigation arises out of an 8-year consulting and employment arrangement between a website designer and software developer in which the parties contemplated, but ultimately failed to consummate, formal integration of their companies.[1]

Ovidiu Podisor is a computer software engineer who founded Innovative Systems (IS) in 1994 with four partners; four years later Podisor acquired majority ownership of IS, and he has served

_____

[1]These facts are drawn from the complaint and supplemented by the jurisdictional discovery submitted by the parties.

1

as the President/CEO since that time.  IS develops proprietary software products and provides software-design and consulting services to other companies.  From 1997-1999 IS developed several software products for Virtual Publisher, Inc., pursuant to a consulting agreement.  One of the software products developed from the consulting agreement between Virtual Publisher and IS was a website-design program called Site Architect.

In May 1999 Web.com Group, Inc. (Website Pros, Inc.),[2] a company that designs websites for small businesses,acquired Site Architect and other assets from Virtual Publisher.  On March 5, 2000 Web.com entered into a consulting services agreement with IS for software development.  In particular, Web.com, through its Vice President of Product Development, Virgina Rago, signed a framework contract with IS, recognizing that IS owned valuable intellectual property, which could be beneficial for the advancement of Web.com's Site Architect product; Web.com also offered to license certain of IS's intellectual property titles, including JavaScript Library and its Perl Object Oriented Library.[3]

---

[2] Web.com Group, Inc. is a Delaware corporation that has had its principal place of business in Jacksonville, Florida, since moving from San Francisco, California in 2000. From 2001 to May 2009 Web.com owned, developed and distributed a website-design software product called NetObjects Fusion.

[3] This licensing arrangement related specifically to the titles IS had delivered to Web.com for use in Site Architect; it did not give Web.com any rights to re-purpose or reuse those assets for another purpose in some other Web.com software that might later be developed.

At the time that IS and Web.com entered into the March 2000 consulting agreement, Podisor was living in Timisoara, Romania. Several months later, Web.com decided to employ Podisor directly, and it made a formal offer of employment to Podisor to become its Chief Engineer in charge of the Site Architect project. Accordingly, in the summer of 2000, Web.com terminated the March 5 Web.com/IS Consulting Agreement, and Podisor, along with two former IS software engineers, went to work for Web.com in San Francisco; Podisor as Web.com's Director-Programming, reporting to Web.com's Manager of Product Development.

Shortly after Podisor relocated from Romania to San Francisco to work for Web.com in 2000, Web.com closed its San Francisco headquarters and moved its offices to Jacksonville, Florida; when it closed the San Francisco office, Web.com terminated those employees, including Podisor. However, shortly thereafter, Podisor moved to Jacksonville and was rehired as Chief Engineer, reporting directly to Web.com's Chief Executive Officer, David Brown. Podisor continued to handle Site Architect for Web.com through 2000 and 2001.

During that same period, IS's engineers in Romania focused on developing new proprietary software products, including WebMail and FileSystem. In the summer of 2001, Web.com licensed WebMail from IS.

A few months later in October 2001, Web.com acquired from another company two new website-building software products: NetObjects Fusion and NetObjects Matrix. Fusion is a desktop-based program designed for installation on an individual computer, and Matrix is a server-based platform, which allows subscribers to create and maintain their websites online.

After acquiring the NetObjects assets, Web.com had to honor an existing commitment to deliver a version of Matrix to IBM, and it had to produce a new version of Fusion. Web.com put Podisor in charge of developing both programs, each of which consisted of over 4 million lines of code.

Given the large amount of work to be done on developing the new versions of Matrix and Fusion, Web.com authorized Podisor to hire additional software engineers to assist with those projects. Podisor enlisted the services of all of IS's software engineers in Romania, as well as a former colleague based in Canada. And, over the next few months, IS hired several more engineers to keep up with the Web.com workload. Although no formal agreement had been executed been IS and Web.com, Web.com paid IS a monthly fee for each software engineer dedicated to the Fusion and Matrix projects, as it previously had done for the Site Architect project.

That working arrangement continued from early 2002 through the summer of 2004, during which time Web.com released three new versions of Fusion: Version 7 was released in the summer of 2002,

4

Version 7.5 in August 2003, and Version 8 in June 2004.  Over that period, IS continued to add software engineers as needed, and its engineers worked almost exclusively on the Fusion and Matrix projects.

It was at some point between the release of Fusion Version 7 and Version 7.5 that some of the conduct underlying the present copyright dispute occurred: someone at Web.com, without IS's authorization, allegedly incorporated IS proprietary files into Fusion.  In particular, during the period from approximately September 2002 to August 2003, another Web.com software engineer (who was not employed by Podisor or IS) either extracted or directed another engineer to extract the IS JavaScript Library and Perl Object Oriented Library from Site Architect, and added those features to Fusion.[4]

Following the release of Fusion Version 8 in June 2004, Web.com officials began discussions with Podisor about formally integrating IS into Web.com. The parties initially contemplated that Web.com would acquire IS for cash, and all IS personnel would become Web.com employees.  However, when Web.com subsequently reduced its offer price by more than one-half and proposed payment in the form of Web.com stock instead of cash, IS rejected that offer.  Podisor later informed Web.com that he would be leaving

---

[4]Apparently this was accomplished without Podisor's knowledge or approval, and Web.com did not seek or obtain licenses authorizing it to use those titles.

Web.com's employment, for personal reasons, but he requested that Web.com and IS execute a new consulting agreement to formalize the terms of their continued relationship.[5]

In October 2004 Web.com and IS entered into a formal consulting agreement. By this agreement, it was understood that IS would support the newly-released Fusion Version 8 and work on updating Matrix, but Web.com suggested that it would develop future versions of Fusion in-house. The 2004 Consulting Agreement between IS and Web.com provided only for the compensation of IS's personnel in Romania.

In January 2005, Podisor formed Innovative Global, and Web.com began paying for Podisor's consulting services through that entity. In the spring of 2005, Web.com was experiencing difficulty developing Fusion Version 9, and it re-enlisted Podisor and Innovative to complete the work necessary for the planned release, which was scheduled to coincide with Web.com's November 2005 initial public offering. As Innovative resumed its development role on the Fusion project, Web.com renewed discussions with Podisor about integrating Innovative into Web.com.

In August 2005, Innovative acquired the assets of a Romanian software design company called Morphusion SRL, which Podisor had

---

[5]By July 2004 Podisor had moved to New Orleans, Louisiana because his wife, in 2003, had been hired as an Assistant Professor in the Department of Mathematical Sciences at Loyola University. Podisor states that he first moved to New Orleans in August 2003; he lived there until July 2006, when he relocated back to Florida.

supported with free advice and business contacts since 2003, and financially since about August 2004. Fusion was designed with an open Application Programming Interface, which allowed third-party software designers to develop "add-ons" that could be integrated with the Fusion product. Morphusion had developed a number of such add-ons, including a number of functional components and a series of templates, called Site Styles, that Fusion users could choose as the design for their websites. Innovative acquired both the Morphusion Components and the Morphusion Site Styles, which at that time were available for purchase through online sellers.

Meanwhile, also in August 2005, Web.com and Podisor had reached an agreement on the terms of Web.com's acquisition of Innovative. Web.com would pay a cash sum for all of Innovative's assets (hard assets and intellectual property) and hire Podisor as a Senior Vice President of Technology. Podisor would retain management authority over the operations in Romania and would oversee the development activities of all of Web.com's applications, including Fusion, Matrix, and WebMail.

Even though the terms of the deal were set, Web.com and Podisor agreed not to formalize it until after the release of Fusion Version 9 and Web.com's IPO, because Web.com believed that finalizing the Innovative acquisition would require Web.com to amend its SEC filings in connection with the IPO. Nevertheless, Web.com asked Innovative to immediately transfer some of its

assets, specifically the Morphusion Components, to Web.com for inclusion into Fusion Version 9, which was set to be released before the IPO.[6]

To ensure the success of the release of Fusion Version 9, and with the expectation that Web.com would purchase the remaining Innovative assets after the IPO as planned, Innovative transferred the Morphusion Components to Web.com;[7] according to jurisdictional discovery, as of August 22, 2005, Web.com and IS executed an Asset Transfer Agreement by which Web.com acquired these Morphusion Components, "add-ons" to its Fusion product. The Asset Transfer Agreement between IS and Web.com includes a choice of law clause selecting Florida law: "This Agreement shall be construed in accordance with the laws of the state of Florida regardless of its choice of laws provision."

All of the Morphusion Components transferred to Web.com by Innovative were included in Fusion Version 9. Together, those components represented almost one-third of the new feature set in Fusion Version 9.

---

[6] Web.com wanted the Morphusion Components because they would allow Web.com to quickly add a large number of new features to Version 9. Because of delays in connection with hiring and training a new team for software development, Version 9 of Fusion offered few new features, and the addition of the significant feature set of the Morphusion Component system was seen as a way to save what otherwise might have been a disappointing release.

[7] The Morphusion Site Styles were not part of that transfer.

About one month after Web.com acquired the Morphusion Components from IS, in September 2005, Web.com and IG executed a formal agreement memorializing their consulting arrangement for software development.

After the release of Fusion Version 9 and Web.com's IPO, Web.com began presenting Podisor with terms for the Innovative Acquisition that differed from those they had agreed upon in September 2005. Most significantly, Web.com indicated that Podisor would not supervise the development of Matrix or Webmail and that he would share control of the Romanian operation with other Web.com management personnel.

Podisor rejected these new proposed terms. Podisor expressed his displeasure with Web.com's attempts to alter the terms of their September 2005 agreement; he explained to Web.com that he believed that the operation he had built in Romania would suffer under the divided management structure Web.com was proposing, and he did not want to undermine the organization he had built in Romania.

Web.com and Podisor continued to discuss terms. In April 2006, Web.com again promised to give Podisor control of the Romanian operations and put him in charge of all Web.com applications except Matrix, and, around June 2006, Web.com agreed that Podisor would control Matrix as well.

Thereafter, the parties delayed the closing of the acquisition transaction until attorneys for both sides could work through some

tax issues.  In June 2006, anticipating his employment at Web.com, Podisor bought a home in Ponte Vedra Beach, just south of Jacksonville, Florida.[8]  Around that same time, Podisor and his wife had their first child, and Web.com started to experience some significant problems in preparing for the release of Fusion Version 10, causing further delay in the closing of the Innovative acquisition deal.

Beginning around July 2006, Web.com stopped making direct payments to IS in Romania and began making all payments for Innovative's combined services exclusively through Podisor and IG.

After the release of Fusion Version 10 in November 2006, Web.com sent a member of its management team to Romania, purportedly to inspect Innovative's operations in advance of the acquisition.  Based on that person's conduct and subsequent representations from Web.com, however, it became clear to Podisor that, once again, Web.com would not make good on its promise to give him sole management authority over the Romanian operations. Podisor ultimately suspended plans to sell Innovative to Web.com. The parties revisited the possibility of an acquisition deal in September 2007, but no agreement was reached after several months of discussions.  (As a result, Web.com never paid Innovative any

_____

[8]According to Podisor, he moved to Florida from Louisiana in July 2006; accordingly "[f]rom its formation in January 2005, until July 2006, Innovative Global's principal place of business was located in New Orleans, Louisiana."

money for the Morphusion Components transferred in connection with the Asset Transfer Agreement in 2005.)

In early 2008, Web.com contacted Podisor regarding a notice it had received from Getty Images that one of the Site Styles in Fusion Version 10 contained an unlicensed copyrighted image. Apparently, the Site Style at issue was one of the Morphusion Site Styles, and Web.com believed that it was among the assets that Innovative had transferred in 2005 for inclusion in Fusion Version 9. Web.com demanded that Innovative pay to resolve the issue with Getty Images.

After investigating the matter, however, Podisor ultimately determined that none of the Morphusion Site Styles were among the assets Innovative transferred to Web.com pursuant to the Asset Transfer Agreement. At that time, however, Podisor realized that Web.com had included a large number of Morphusion Site Styles in Fusion Version 10 without Innovative's authorization. (Podisor and Innovative were not responsible for maintaining or updating Site Styles for Fusion Version 10). When Podisor informed Web.com that Innovative had not transferred or otherwise authorized Web.com's use of the Morphusion Site Styles, Web.com acknowledged that the Site Styles were not part of the asset transfer, and it dropped its request that Innovative pay to resolve the Getty issues.

Innovative continued to develop and support Fusion for Web.com through the first half of 2008, but the parties eventually agreed

that they would end their relationship.  Pursuant to the terms of the IS consulting agreement (the October 2004 agreement), Web.com agreed to provide four months notice to allow Innovative to comply with Romanian employment law, which requires employers to provide such notice before undertaking collective workforce reductions; Web.com and Innovative agreed that the four-month notice would be effective July 31, 2008.[9]

Web.com and Innovative also agreed on a wind-down payment schedule, pursuant to which Web.com would pay Innovative its final monthly installment upon Innovative's delivery of the Fusion source code and its resolution of some outstanding issues raised by Web.com.  One of the issues raised by Web.com involved an IS copyright notice that appeared as a "header" in the JavaScript code for Fusion Version 7.5.  In investigating why such a notice appeared in the Fusion code, Podisor determined that one of the former IS employees (who went to work for Web.com with Podisor in 2000) had accessed and included into Fusion Version 7.5 certain files from a copyrighted JavaScript Library created by IS. Innovative did not authorize Web.com to use that copyrighted material.  It is their contention that Web.com also has included other IS proprietary files into the Fusion product without

---

[9]On July 31, 2008 Web.com emailed Podisor confirming that (i) the agreement to terminate Web.com's consulting relationship with Podisor and IS; (ii) the July 31, 2008 effective date of termination; and (iii) the mutually agreed four-month severance period.

authorization.

Innovative provided Web.com with all of the Fusion source code in January 2009, and it resolved all of the other outstanding issues raised by Web.com by March 31, 2009. In accordance with the agreed-upon termination protocol, Web.com was then obligated to pay the remaining amount it owed to Innovative. But it never has done so.

In fact, according to Innovative and Podisor, Web.com refused to pay Innovative the amount it was owed, unless Innovative would execute an agreement purporting to grant Web.com rights to a broad category of Innovative intellectual property. It is Innovative's and Podisor's position, however, that nothing in the Consulting Agreement executed by Innovative and Web.com provides for the execution of any such agreement as a condition of Web.com's payment for services rendered by Innovative. Although more then 100 people served in various development roles over the life of Web.com's ownership of Fusion, Web.com also insisted that Podisor and Innovative assume full and undivided liability for all versions of Fusion, even those versions on which Podisor/Innovative did not work. Nothing in the Consulting Agreement executed by Innovative and Web.com provides for the execution of any such agreement as a condition of Web.com's payment for services rendered by Innovative.

Web.com represented to Innovative that the proposed agreement was intended only to confirm Web.com's rights to the material

included in its products during the time that Innovative and Podisor worked on those products, but Innovative and Podisor insist that the agreement presented to Innovative by Web.com went far beyond that narrow purpose. While Podisor and Innovative were willing to address Web.com's concerns about its rights to the intellectual property in its products, Innovative refused to agree to an overly broad forfeiture of its intellectual property rights just to get paid for what it was already contractually entitled to receive. Podisor and Innovative also refused to assume all product liability for Fusion.

As a result of Web.com's refusal to honor its obligations under the consulting agreements, and in order to make the payments to its employees required by Romanian law, Podisor had to first borrow money to pay immediate liabilities of Innovative, and later sold stock to repay those loans, resulting in significant losses to Mr. Podisor personally. Web.com was aware that Innovative was obligated to make those payments when it agreed to provide four months notice of the termination of the Innovative consulting agreements.

In May 2009, Web.com sold its Fusion business to NetObjects, Inc., a new corporation formed with the same name as the original developer of Fusion and Matrix. NetObjects develops and sells website design software; it is incorporated under Delaware law and its headquarters are in Doylestown, Pennsylvania. According to the

plaintiffs, the versions of Fusion produced and distributed by NetObjects continue to include Innovative's copyrighted materials without Innovative's consent.

The plaintiffs contend that Podisor has repeatedly attempted over many months to get Web.com to comply with its contractual obligations and to negotiate a reasonable licensing arrangement for the Innovative intellectual property that was included in Fusion without authorization, incurring significant attorneys fees in the process.[10] They further suggest that Web.com has refused to pay the amounts it owes without a broad licensing agreement, and it has refused to pay a reasonable fee for those licensing rights. As a result, on February 25, 2012 Innovative Global Services, LLC, Innovative Systems SRL, and Ovidiu Podisor sued Web.com, Inc. and NetObjects, Inc. to protect their intellectual property rights and recover monies owed under their contracts. In particular, the plaintiffs assert claims for willful copyright infringement against both Web.com and NetObjects based on their allegation that Web.com (during its employment/consulting relationship with Podisor and his companies) improperly included proprietary files allegedly belonging to IS, including the Morphusion Site Styles as well as JavaScript Library and Perl Object Oriented Library, into the Fusion product sold to NetObjects; and NetObjects continues to

---

[10]According to Posidor, in August 2009 he moved from Florida back to New Orleans, where he currently resides.

produce and distribute Fusion, which utilizes Innovative's copyrighted works without authorization.[11]  The plaintiffs also assert that Web.com breached contracts: (1) Web.com breached the consulting agreements between IS and Web.com in 2004 and breached the consulting agreement between IG and Web.com in 2005 "by refusing to pay [IS and IG] the full amount they were owed for services rendered under the consulting agreements" and (2) Web.com breached the Morphusion Components Asset Transfer Agreement when, after Innovative partially performed its obligations by transferring the Morphusion Components to Web.com, "[Web.com] breached that agreement by failing to acquire Innovative and hire Podisor pursuant to the terms agreed upon by the parties", entitling plaintiffs to damages or rescission of the Asset Transfer

---

[11]The plaintiffs allege:

By including the Morphusion Site Styles, Innovative Systems JavaScript Library, Innovative Systems Perl Object Oriented Library, and other Innovative Systems proprietary files into the Fusion product without authorization from Innovative Systems, [Web.com] has unlawfully infringed on Innovative's copyrighted works in violation of 17 U.S.C. § 106....
By continuing to produce and distribute the Fusion product, which utilizes Innovative's copyrighted works without authorization, NetObjects has unlawfully infringed on Innovative's copyrighted works in violation of 17 U.S.C. § 106....

Agreement.[12]  Finally, in the alternative, the plaintiffs assert claims for (a) error or failure of cause; (b) unjust enrichment; and (c) detrimental reliance.

On March 13, 2012 NetObjects filed a declaratory judgment action in Florida against IG, IS, and Podisor, seeking declarations that (1) NetObjects is the rightful owner, user, and distributor of Fusion and its source code; (2) neither IG, IS, nor Podisor have any legally cognizable, protective, or enforceable intellectual property rights to Fusion or its source code. Web.com has also filed suit against IG, IS, and Podisor in Florida, in which Web.com seeks damages for breach of contract and declaratory judgment.

Web.com and NetObjects now each seek to dismiss this lawsuit for lack of personal jurisdiction or improper venue or, alternatively, they seek to transfer this suit to the Middle District of Florida, Jacksonville Division.


I.
*A.*

Rule 12(b)(2) of the Federal Rules of Civil Procedure allows a defendant to challenge the Court's exercise of personal jurisdiction over it.

---

[12]As to both breach of contract claims, the plaintiffs invoke Louisiana's bad faith breach of contract provision, Louisiana Civil Code article 1997 in light of their allegation that Web.com's failure to perform was intentional or malicious.

When nonresident defendants like Web.com and NetObjects seek dismissal for lack of personal jurisdiction under Rule 12(b)(2), the plaintiffs bear the burden of establishing the Court's jurisdiction over the defendant, but need only make a prima facie case if the Court rules without an evidentiary hearing. See Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008); see also Luv N' Care v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir.), cert. denied, 548 U.S. 904 (2006). The Court takes all uncontroverted allegations in the complaint as true and resolves any conflicts in the plaintiffs' favor. Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994). The Court is not restricted to pleadings, but may consider affidavits, interrogatories, depositions, or any other appropriate method of discovery. Id.; see Jobe v. ATR Mktg., Inc., 87 F.3d 751, 752 (5th Cir. 1996).

*B.*

The Court may exercise personal jurisdiction over a nonresident defendant only if two requirements are satisfied: (1) the forum state's long-arm statute confers personal jurisdiction; and (2) the exercise of jurisdiction comports with Due Process. See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006). Because the limits of Louisiana's long-arm statute are co-extensive with the limits of constitutional due process, the two-part inquiry merges into one: whether this Court's exercise of jurisdiction over the defendants would offend due process. See La.

R.S. 13:3201(B)(providing that a Louisiana court "may exercise personal jurisdiction over a nonresident on any basis consistent with . . . the Constitution of the United States"); <u>Luv N' Care</u>, 438 F.3d at 469; <u>see</u> <u>also</u> <u>Electrosource, Inc. v. Horizon Battery Techs., Ltd.</u>, 176 F.3d 867, 871 (5th Cir. 1999).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 471-72 (1985)(citing <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 319 (1945)); <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 413-14 (1994)(The Due Process Clause limits the Court's power to assert personal jurisdiction over a nonresident defendant.). In order to conclude that the exercise of personal jurisdiction comports with Due Process it must be shown that (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state; and (2) the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." <u>Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colorado</u>, 615 F.3d 364, 367 (5th Cir. 2010)(citations omitted). "The 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being

haled into court'" in the forum state. <u>McFadin v. Gerber</u>, 587 F.3d 753, 759 (5ᵗʰ Cir. 2009), <u>cert.</u> <u>denied</u>, 131 S.Ct. 68 (2010).

The minimum contacts inquiry takes two forms, and the constitutional limitations on the exercise of personal jurisdiction differ depending on whether a court is asked to exercise general or specific jurisdiction over the defendant. <u>Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colorado</u>, 615 F.3d at 368 ("The 'minimum contacts' prong of the two-part test may be further subdivided into contacts that give rise to 'general' personal jurisdiction and 'specific' personal jurisdiction."). Regardless of whether the lawsuit is related to the defendant's contacts with the forum, courts may exercise general jurisdiction over any lawsuit brought against a defendant that has substantial, continuous, and systematic general contacts with the forum state. <u>See</u> <u>Seiferth</u>, 472 F.3d at 271 (citing <u>Helicopteros Nactionales</u> 466 at 413-14); <u>Moncrief Oil Int'l Inc. v. OAO Gazprom</u>, 481 F.3d 309, 312 (5ᵗʰ Cir. 2007)("Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction."). "If", on the other hand, "a defendant has relatively few contacts, a court may still exercise specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'" <u>Id.</u> General jurisdiction focuses on incidents of continuous activity within the disputed forum; specific jurisdiction is more constrained by virtue of a very limited nexus with the forum.

20

If a plaintiff demonstrates minimum contacts between the defendant and the forum state, then the Court may exercise personal jurisdiction unless the defendant makes a "compelling case" that the exercise of jurisdiction is unfair or unreasonable. Burger King Corp. V. Rudzewicz, 471 U.S. 462, 477 (1985); Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999). In determining whether the exercise of jurisdiction is fair and reasonable, the Court considers certain fairness factors: (1) the burden on the non-resident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies. See Nuovo Pignone v. Storman Asia M/V, 310 F.3d 374, 382 (5th Cir. 2002)(citation omitted).

The defendants contend that the Court lacks personal jurisdiction over them because the plaintiffs fail to allege any jurisdictional nexus between them and the State of Louisiana; the defendants maintain that they lack sufficient contacts with Louisiana for the Court to assert personal jurisdiction over them.

II.

A.   General Jurisdiction

The Court begins with the plaintiffs' contention that the defendants have contacts with Louisiana sufficient to confer

general jurisdiction.

A court has general jurisdiction over a nonresident defendant "to hear any and all claims" against him when his contacts with the state are so "'continuous and systematic' as to render [him] essentially at home in the forum." Goodyear Dunlop Tires Operations v. Brown, 131 S.Ct. 2846, 2851 (2011). The general jurisdiction inquiry is "dispute blind, the sole focus being on whether there are continuous and systematic contacts between the defendant and the forum." Dickson Marine, Inc. v. Panalina, Inc., 179 F.3d 331, 339 (5th Cir. 1999). Rather than mere "minimum" contacts, "continuous and systematic" contacts must exist between the state and the foreign defendant because "the forum state does not have an interest in the cause of action." Id. The Fifth Circuit has noted that the continuous and systematic test "is a difficult one to meet, requiring extensive contacts between a defendant and a forum." Submersible Sys., Inc. v. Perforadora Cent., 249 F.3d 413, 419 (5th Cir. 2001). "[V]ague and overgeneralized assertions that give no indication as to extent, duration, or frequency of contacts are insufficient to support general jurisdiction." Johnston v. Multidata Sys. Int'l Corp.,, 523 F.3d 602, 610 (5th Cir. 2008) (citation omitted)(reviewing past cases "to illustrate just how difficult it is to establish general jurisdiction"). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a

reasonable number of years, up to the date the suit was filed." Id. (quoting Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 717 (5th Cir. 1999)).

For Web.com and NetObjects to be subject to general jurisdiction here, each must independently have had continuous and systematic general contacts with Louisiana. In considering whether the plaintiffs have made a prima facie case that sufficient contacts exist to justify the exercise of general jurisdiction, the Court considers the affidavits and other evidence presented to it. See Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985).

Before evaluating the contacts between the respective defendants and Louisiana, the Court considers a threshold general personal jurisdiction theory advanced by plaintiffs as to both Web.com and NetObjects: the plaintiffs insist that NetObjects' and Web.com's commercial activity as conducted over the internet supports a finding of general personal jurisdiction. To the extent that the plaintiffs invite the Court to hold, as a matter of law, that the defendants' operation of fully interactive websites establishes that the defendants have the sort of continuous and systematic contacts with Louisiana sufficient to confer general personal jurisdiction, the Court declines to do so.

The plaintiffs lean heavily on Mink v. AAAA Development LLC, 190 F.3d 333 (5th Cir. 1999), in which the Fifth Circuit "adopt[ed]"

the _Zippo_ sliding scale method to analyze whether general personal jurisdiction could be permissibly exercised over a defendant operating an internet website; plaintiffs insist that this Court may properly exercise jurisdiction over the defendants because they both operate interactive websites.[13]  But the plaintiffs' reliance on _Mink_ to advance their general jurisdiction theory is misinformed:  the Fifth Circuit has since retreated from applying the sliding scale method in the context of general jurisdiction inquiries:

> While we deployed this sliding scale in _Mink v. AAAA Development LLC,_ it is not well adapted to the general jurisdiction inquiry, because even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction–in other words, while it may be doing business _with_ Texas, it is not doing business _in_ Texas.

_Revell v. Lidov_, 317 F.3d 467, 471 (5th Cir. 2002)(emphasis in original)(noting that "_Zippo_'s scale does more work with specific

---

[13]In _Zippo Manufacturing Co. v. Zippo Dot Com, Inc._, the Western District of Pennsylvania used a sliding scale to measure an internet site's connections to the forum state.  952 F. Supp. 1119 (W.D. Pa. 1997).  The Fifth Circuit found helpful its categorization of internet use into a spectrum of three areas; at one end of the scale was a passive website, in which the owner simply posted information or advertised on the internet; operation of a passive site would not be sufficient to establish personal jurisdiction.  At the other end of the scale are website owners of interactive websites that engage in repeated online contacts with forum residents, including doing business; in these cases, personal jurisdiction may be proper.  In between, are websites with some interactive elements that requires the court to examine the extent of the interactivity and the nature of the forum contacts.  _See_ _Mink_, 190 F.3d at 336 ("[w]e find that the reasoning of Zippo is persuasive and adopt it in this Circuit").

jurisdiction-the context in which it was originally conceived").

In <u>Revell</u>,[14] the Fifth Circuit determined that the defendant university's internet presence in Texas was insubstantial; the defendant never received more than 20 internet subscriptions to the Columbia Journalism Review from Texas residents.    <u>Id.</u>

### 1. NetObjects

NetObjects contends that the Court lacks general jurisdiction over it in light of the following jurisdictional facts:

- NetObjects is a Delaware corporation and has maintained its principal place of business in Doylestown, Pennsylvania since its formation in January 2009.
- NetObjects has never maintained any offices, facilities, or headquarters in Louisiana; nor has it ever had any business operations in Louisiana.
- NetObjects does not own any real estate or other property in Louisiana.
- NetObjects has never maintained any accounts with financial institutions in Louisiana.
- NetObjects does not and has never paid taxes to Louisiana.
- None of NetObjects' software products are researched, developed, or operated by NetObjects in Louisiana.
- Although NetObjects advertises and sells its website development services nationwide, less than three-tenths of one percent of its total revenue (.0027%) came from Louisiana in 2011.

The Court agrees: given these jurisdictional facts, the plaintiff has not shown that NetObjects has the kind of systematic and

_____

[14]Oliver Revell, a Texas resident and former associate director of FBI, sued nonresidents, including Hart Lidov, an assistant professor at Harvard Medical School, who wrote an article singling out Revell and accusing him of complicity in the conspiracy and cover-up of the terrorist bombing of Pan Am Flight 103; Revell also sued Columbia University because Lidov posted his article on a website maintained by its School of Journalism.  <u>Id.</u> at 469. Both defendants moved to dismiss for lack of personal jurisdiction.  <u>Id.</u>

continuous contacts with Louisiana sufficient to support this Court's exercise of general jurisdiction.

2. Web.com

Web.com contends that this Court lacks general jurisdiction over it based on the following jurisdictional facts:

- Web.com's principal operations and offices have been located in Jacksonville, Florida since Web.com moved its offices from San Francisco, California in 2000.
- Web.com does not maintain and never maintained any offices, facilities, or headquarters in Louisiana; and Web.com does not have and never has had any business operations in Louisiana.
- Web.com does not own any real estate or other property in Louisiana; nor has Web.com ever maintained any accounts with financial institutions in Louisiana.
- Web.com does not pay and has never paid taxes to Louisiana.
- None of Web.com's software products are researched, developed, or operated by Web.com in Louisiana.
- Although Web.com advertises and sells its website development services nationwide, less than 1% (approximately .6431%) of Web.com's business came from Louisiana in 2011.
- Web.com engages in national marketing efforts through email and telemarketing; the calls to Louisiana from 2008-2009 account for less than 1.506% of all telephone solicitations.

The Court finds that the plaintiffs have failed to make a prima facie case of general jurisdiction: Web.com's contacts with Louisiana do not amount to the "continuous and systematic" contracts required for general jurisdiction. See generally Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408 (1984)(finding no personal jurisdiction over a defendant in Texas, notwithstanding a number of contacts, including purchasing

helicopters and parts for seven years, sending pilots to Texas for training, and one visit to Texas by defendant's chief executive officer).[15]

B.  Specific Jurisdiction

"In contrast to general, all-purpose jurisdiction, specific

_____

[15]The plaintiffs focus on the number as opposed to the percentage of calls Web.com made to Louisiana residents in urging this Court to exercise general personal jurisdiction.  But the plaintiffs fail to convince the Court that some marketing and sales in Louisiana amount to substantial, continuous, and systematic contacts required to exercise general jurisdiction.  If the Court accepted the plaintiffs' argument, then Web.com and other companies that operate a fully interactive website and engage in national marketing campaigns would be subject to general personal jurisdiction in every state in the country, as a matter of law, and without analysis of the quality or quantity of those contacts or their purposeful availment of the relevant forum.  The plaintiffs fail to convince the Court to take that leap.  Cf. Goodyear Dunlop Tires Operations v. Brown, 131 S.Ct. 2846, 2856 (2011)(rejecting "sprawling view of general jurisdiction urged by" plaintiff in which "any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed"); see Jackson v. Tanfoglio Giuseppe, S.R.L., 615 F.3d 579, 584-85 (5th Cir. 2010)(holding that no general personal jurisdiction existed over defendant manufacturer that had no office, bank accounts, employees, postal address, or property in the forum state, and that was neither registered to do business nor paid taxes in the forum state; the only contacts with the forum were that the handguns the defendant supplied parts for in another state were sold in the forum state, it attended two trade shows in the forum, and it advertised and marketed in nationwide media that reached the forum state); see also Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 611-14 (5th Cir. 2008)(illustrating "just how difficult it is to establish general jurisdiction" and holding that general personal jurisdiction was lacking over defendants including defendant that maintained no business in the forum, despite the fact that over a five year period, the defendant had sold $140,000 worth of goods and service-related contracts to customers in the forum, representing three percent of the defendant's business, its employees periodically traveled to the forum, and its advertisements in national publications reached the forum).

jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" <u>Goodyear Dunlop Tires Operations</u>, 131 S.Ct. at 2851. The Fifth Circuit has articulated a three-step personal jurisdiction inquiry "fully applicable to jurisdiction questions generated by" the Internet:

> (1) Did the plaintiff's cause of action arise out of or result from the defendant's forum-related contacts?

> (2) Did the defendant purposefully direct its activities toward the forum state or purposefully avail itself of the privilege of conducting activities therein; and

> (3) Would the exercise of personal jurisdiction over the defendant be reasonable and fair?

<u>Pervasive Software, Inc. v. Lexware GMBH & Co. KG</u>, 688 F.3d 214, 227 (5th Cir. 2012).[16] "[T]he defendant's contacts [with the forum] must be more than 'random, fortuitous, or attenuated, or of the unilateral activity of another party or third person,'"; however, the Fifth Circuit observes that, unlike general jurisdiction, "specific jurisdiction may exist where there are only isolated or sporadic contacts' can support specific jurisdiction so long as the plaintiff's claim relates to or arises out of those contacts."

---

[16]If the plaintiff establishes (1) and (2), then the burden shifts to the defendant, who must show that it would be unfair or unreasonable to exercise jurisdiction. <u>Id.</u>

ITL, Int'l, Inc. v. Constenla, S.A., 669 F.3d 493, 498-99 (5th Cir. 2012)(citations omitted).

Finally, specific personal jurisdiction is claim-specific; that is, if a plaintiff's claims relate to different forum contacts of the defendant, then specific jurisdiction must be established for each claim. Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006); McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009), cert. denied, 131 S.Ct. 68 (2010).

1.  Copyright infringement

Mindful of these specific jurisdiction principles, the Court must determine whether the defendants' contacts with Louisiana arise out of or relate to the plaintiffs' copyright infringement claim, in which the plaintiffs allege:

> 54.
> By including the Morphusion Site Styles, Innovative Systems JavaScript Library, Innovative Systems Perl Object Oriented Library, and other Innovative Systems proprietary files into the Fusion product without authorization from Innovative Systems, [Web.com] has unlawfully infringed on Innovative's copyrighted works in violation of 17 U.S.C. § 106.
>
> 55.
> [Web.com] has willfully engaged in the acts complained of without the expressed or implied permission fo Innovative or Podisor.
>
> 56.
> By continuing to produce and distribute the Fusion product, which utilizes Innovative's copyrighted works without authorization, NetObjects has unlawfully infringed on Innovative's copyrighted works in violation of 17 U.S.C. § 106.

NetObjects has willfully engaged in the acts complained
of without the expressed or implied permission of
Innovative or Podisor.

The plaintiffs advance the same specific personal jurisdiction theory -- invoking the <u>Calder</u> effects test -- as to both defendants: because the defendants expressly aimed intentional tortious activity into Louisiana by offering Fusion for sale in the forum state, the plaintiffs suggest, the defendants have minimum contacts sufficient to warrant exercise of specific jurisdiction. The Court disagrees; intentionally aiming tortious conduct at the forum does not satisfy all three requirements for specific jurisdiction.

The plaintiffs assert that <u>Calder v. Jones</u>, 465 U.S. 783 (1984) authorizes the exercise of specific jurisdiction over a defendant who engages in intentional tortious conduct intended to injure the plaintiff in the forum state. But <u>Calder</u> is more limited in scope than plaintiffs suggest. In <u>Calder</u>, a professional entertainer in California brought suit for defamation and related torts against the author and editor of an article, both of whom were based in Florida. Their article was published in a nationally-distributed newspaper with its highest circulation in California. In unanimously holding that a California district court could exercise its personal jurisdiction over the author and editor, the U.S. Supreme Court noted:

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.

Id. at 788-89. Also compelling to the High Court was that the author and editor prepared for publication an article which they knew would have a potentially devastating impact upon the entertainer: "they knew the brunt of that injury would be felt by [the entertainer] in the State in which she lives and works." Id. at 790-791.

Significantly, the U.S. Court of Appeals for the Fifth Circuit has held that the "effects" test of Calder is "not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state." Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir. 1997). Instead, Calder's applicability is limited to cases in which "allegedly tortious acts . . . were expressly aimed at the forum state and the nonresident defendants knew that their acts would have an impact on the plaintiff in the forum state." Id. "Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum." Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212 (5th Cir. 1999).

31

Because "the plaintiff's residence in the forum, and suffering of harm there, will not alone support [personal] jurisdiction", the plaintiffs' invocation of <u>Calder</u> falls short.  Podisor's residence in Louisiana is not sufficient to confer specific jurisdiction over both Web.com and NetObjects.  By relying solely on <u>Calder</u>, the plaintiffs have failed to satisfy their prima facie case on specific jurisdiction as to both Web.com and NetObjects with respect to plaintiffs' copyright infringement claims.[17]

2.   Breach of Contract Claims

The plaintiffs allege that Web.com breached the 2004 and 2005 consulting agreements by refusing to pay Innovative Systems and Innovative Global the full amount owed for consulting services; that Web.com breached the Morphusion Components Asset Transfer Agreement by failing to acquire Innovative and hire Podisor after Innovative transferred the components to Web.com; and alternatively that Web.com's failure to honor the acquisition constitutes a

---

[17]Web.com contends that the Court lacks specific jurisdiction over it because the Court must consider a defendant's contacts with the forum state at the time the plaintiff filed the complaint; because the plaintiffs acknowledge in their complaint that Web.com sold the Fusion software to NetObjects in May 2009, when the lawsuit was filed on February 25, 2012, Web.com was not selling Fusion in Louisiana (or anywhere else).

Finally, Web.com also points out, and it is worth noting, that the Fifth Circuit has cautioned against applying a stream of commerce principle to copyright claims.  "Where we have been presented the opportunity to extend the principle to other areas such as contract or copyright, we have found the defendant's delivery of products into the stream-of-commerce to be unrelated to the cause of action."  <u>Nuovo Pignone, SpA v. Storman Asia M/V</u>, 310 F.3d 374, 381 (5th Cir. 2002).

failure of cause; and alternatively that Web.com was unjustly enriched by receiving the transfer of Morphusion Components; and finally alternatively that the plaintiffs detrimentally relied on Web.com's representations that it would follow through on the acquisition.

Each claim must be analyzed separately but the plaintiffs' proposed jurisdictional hook advanced for the plaintiffs' contract-related claims is Podisor's choice to reside in Louisiana from August 2003 to July 2006 and again since August 2009. Web.com, however, insists that Podisor's residency cannot subject Web.com to specific jurisdiction on the breach of contract claims. The Court agrees.

It is well established within the Fifth Circuit that "merely contracting with a resident of the forum state does not establish minimum contacts." McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)(citing Burger King, 471 U.S. at 478), cert. denied, 131 S.Ct. 68 (2010). Therefore, the fact that Web.com has a consulting contract and asset transfer agreement with a Louisiana resident (and a Romanian company)[18] is not dispositive of specific personal

_____

[18]The plaintiffs allege that the consulting agreements were between Web.com and IS and IG and that Web.com's asset transfer agreement was with Innovative; Podisor, who resides in Louisiana, was the sole member and president/CEO of IG and the majority owner and president/CEO of IS but IS is a Romanian company with its principal place of business in Romania. Web.com points out that the breach of contract claims arise from contracts with IS and IG, not Podisor. Even considering Podisor's Louisiana residence, however, it is clear that "[j]urisdiction must not be

jurisdiction. Courts consider the parties' prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing. See Burger King, 471 U.S. at 479. The Court's focus must be on the relationship between the defendant, the forum, and the litigation. In fact, the plaintiffs do not suggest sufficient contacts between Web.com with Louisiana that give rise to their contract claims; other than the residence of Podisor (off and on) in Louisiana and the fact that Web.com wired payments to IG's Louisiana bank account and communications while Podisor was in Louisiana. But these contacts do not arise out of or result from Web.com's contact with Louisiana; rather, they "rest[] on nothing but 'the mere fortuity that [Mr. Podisor] happen[ed] to be a resident of the forum.'" See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773 (5th Cir. 1986)(citations omitted). Having failed to establish the threshold requirements of the Fifth Circuit's framework, the plaintiffs have not met their burden; there is not specific jurisdiction to support personal jurisdiction over the Web.com.

Accordingly, Web.com's motion to dismiss for lack of personal jurisdiction is GRANTED and NetObject's motion to dismiss for lack

---

based on the fortuity of one party residing in the forum state." McFadin, 587 F.3d at 760 (citations omitted).

of personal jurisdiction is also GRANTED.[19]

New Orleans, Louisiana, September 27, 2012

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[19]Because the Court has determined that it lacks personal jurisdiction over the defendants, it need not reach the defendants' alternative requests that the Court dismiss the plaintiffs' claims for improper venue or transfer this matter to the Middle District of Florida.